Nathan FRIEDMAN, Respondent,

v.

DIVISION OF HEALTH of
Missouri, Appellant.

No. 59124.

Supreme Court of Missouri,
En Banc.

May 5, 1976.
Modified on Court's Own Motion.
Rehearing Denied June 14, 1976.

John C. Danforth, Atty. Gen. by Louren Wood, Jefferson City, for appellant.

Charles C. Shafer, Jr., Kansas City, for respondent.

SEILER, Chief Justice.

This case presents the question of whether the division of health in considering the revocation of a practical nursing home license for failure to meet the requirements of the rules and regulations prescribed by the division for the operation of practical nursing homes, may take into consideration the licensee's compliance or noncompliance

during the preceding several years or whether the division is limited to consideration of the licensee's compliance or noncompliance during the current license year. The operator contends the latter, on the theory that the issuance of the current license constituted condonation or waiver of deficiencies existing in prior years. The director of the division of health adopted the first view, taking into consideration violations occurring in the years 1968–1970, as well as those in 1971, and revoked the license previously issued. On petition to review, the circuit court agreed with respondent and limited the division to the year 1971, and then, counsel for the division having expressed the opinion that the revocation of the license could not be supported on the evidence relating to the time so limited, the trial court vacated the order of the director revoking the 1971 license and ordered licenses issued for the years 1971, 1972 and 1973.[1] The division has appealed. The judgment was affirmed by the court of appeals, Kansas City district, following which, on motion of appellant, the cause was ordered transferred here because it involves an issue of statewide interest and concern pertaining to the effective enforcement by the division of health of the standards and requirements prescribed for licensed nursing homes in Missouri. We reverse and remand with directions to affirm the action of the director in revoking respondent's license.

Respondent Friedman is the operator of Riverscene Nursing Home in Kansas City, Missouri. He was first licensed by the division of health in November 1967 to operate Riverscene, with a capacity of 101 patients and 25 bed patients. The division, after notice and a series of hearings, revoked the current license by reason of a number of failures to comply with the requirements and minimum standards promulgated by the division for the operation of nursing homes which occurred in varying degrees throughout the period of his operation of Riverscene.

In his administrative decision to revoke the license, the director made findings of fact specifying violation of regulations as to personnel, medications, medical orders and records, nursing care, furnishings, equipment and supplies, and fire, insect and rodent control and concluded that the management had consistently failed to satisfy the requirements and had violated the minimum standards, constituting a substantial failure to comply.

■ Was there competent substantial evidence to support the revocation of respondent's license? The findings and conclusions of the director are amply supported by the record. The nursing home was inspected a number of times in the years 1968–1971. In general, it was dirty and noisome. Housekeeping was poor. Many patients were unkempt, odorous and their rooms, bed and linens were far from being tidy and clean. Flies and roaches were prevalent. Pieces of furniture were in disrepair, the windows were dirty, and floors were not clean. The requirements as to number of licensed practical nurses or registered nurses on duty were not met. The operator was lax about having the required personnel on weekends. There was not sufficient housekeeping personnel, which led to nurse's aides doing housekeeping work, which reduced the care available for the patients. Patient records were not current. Some of the exit doors were hard to open. There was unsupervised use permitted of matches and smoking. Inflammable liquids were stored on the premises. All in all, there was a clear pattern over the three or four year period involved of an operation which was marginal at best and submarginal a good deal of the time.

When we stop to realize that "Nursing home patients present a particular problem

1. The circuit court's order was issued August 16, 1973. The original hearings were in 1971. On petition for review in the circuit court of the director's order to revoke, it turned out the transcription was incomplete because of malfunction of the tape recorder, so the cause was remanded for further proceedings before the division. After further hearings, the director again ordered the license revoked and again the respondent petitioned the circuit court for review. By this time it was 1973.

because of several factors: (1) their advanced age (average 82); (2) their failing health (average four disabilities); (3) their mental disabilities (55 percent are mentally impaired); (4) their reduced mobility (less than half can walk); (5) their sensory impairment (loss of hearing, vision, or smell); (6) their reduced tolerance to heat, smoke and gases; and (7) their greater susceptibility to shock" [Nursing Home Care in the United States: Failure in Public Policy, Supporting Paper No. 7, Report of the Subcommittee on Long-Term Care of the Special Committee on Aging, United States Senate, 94th Congress, 2d Session, xx (1976)], it underscores the unacceptableness of the conditions to which these fragile human beings were subjected in respondent's home and demonstrates how the pattern and persistence of respondent's past violations would bear on the significance which the division could reasonably attach to similar current violations on the part of respondent.

We now turn to examination of the Missouri statutes governing nursing homes. Acting swiftly in response to an aroused public, the Missouri legislature enacted the present nursing home law, with an emergency clause, a few weeks after the disastrous nursing home fire in Warrenton, Missouri in 1957 in which 73 elderly patients were burned to death.[2] *State ex rel. Eagleton v. Patrick,* 370 S.W.2d 254, 257 (Mo. 1963). The enactment was said in the *Patrick* case to be "a vital and most important exercise of the state's police power."

Under prior nursing home statutes, S.B. 142, Laws of Mo.1941, p. 368, appearing in the 1949 Revised Statutes as Ch. 198, §§ 198.010–070, and the amendments in 1955, H.B. 171, Laws of Mo.1955, p. 698, it was expressly made the duty of the State Board of Health to inspect at least annually all nursing homes in the state and to grant licenses for a period not to exceed one year, after inspection. In both the 1941 and the 1955 acts it was expressly provided that the license should expire one year after date of issuance.

■ The 1957 act, S.B. 41, Laws of Mo.1957, p. 666, now §§ 198.011–170,[3] which has been described by Dr. H. M. Hardwicke, former director, as a model act, Nursing Homes Magazine, August 1962, is much different in these respects. It contains no requirement for an annual inspection of a licensed home. The license is renewable annually, but the language used is that it "*shall* be renewable annually" (emphasis added). All that is required is payment of the annual fee and approval for renewal by the division. Section 198.025(1). No mention of inspections, annual or otherwise, is made in conjunction with this provision for renewals. For the division not to renew requires notice and a hearing by the division, with right to judicial review. Section 198.140. A license which shall be renewable unless revoked or suspended is a continuing license, not an annual license. *State ex rel. Wolfe v. Missouri Dental Board,* 289 Mo. 520, 233 S.W. 390 (banc 1921); *Payne v. Real Estate Commissioner of California,* 93 Cal.App.2d 532, 209 P.2d 419, 421–22 (1949); *State ex rel. Amer. Inst. Mktg. Sys., Inc. v. Missouri Real Estate Comm.,* 461 S.W.2d 902 (Mo.App.1970). The "approval or renewal by the division" language is to prevent renewal of revoked or suspended licenses or unauthorized transfers or assignments. As noted, the language of expiration one year after issuance was repealed in the 1957 act. By enacting § 198.025, the legislature was creating a license of other than an annually expiring nature, providing the holder thereof desires to continue in business and pays the required fee.[4]

---

**2.** The statute became effective March 13, 1957, S.B. 41, 69th General Assembly, regular session. The fire occurred February 17, 1957.

**3.** Hereinafter all statutory references are to RSMo 1969.

**4.** The concept of a continuing license is not new to the Missouri legislature. In fact, the continuing license is the most usual form of health care licensure in Missouri law. For many regulated activities, licenses are renewed as here, in effect upon a simple payment of the annual fee. In each such case, as here, the regulatory agency is authorized to make inspections but is not required to do so annually.

Section 198.120 concerns denial of initial applications for licenses, while § 198.130 concerns revocations or denials of renewals. We note that they are clearly treated differently, the initial inspection requirement not being related to any further inspection requirement. Inspections are still carried on, of course, because the division has a continuing duty to protect the public. But, further inspections are not a condition precedent for the annual renewals.

■ The procedure for revocation, denial or refusal to renew a license is established in § 198.140. These actions are "authorized . . . in any case in which [the division] finds there has been a substantial failure to comply with the requirements established under this law." No time frame is given in reference to the failures or findings. The section does not say "failures during the current license year" or some variation thereof. The scope of the inspection logically includes the prior years in the life of the institution so far as they shed light on whether present deficiencies and shortcomings are continuations of past patterns and likely to continue.

We do not believe it was the intention of the legislature that the annual renewal of the license should operate as a shield from inquiry by the division into the pattern of the operator's behavior and course of conduct over a number of years or as imposing a statute of limitations of one year (or less) upon the division in acting on violations of standards and regulations by a licensed nursing home. If such were the case then revocation of licenses could be justified only by conditions occurring in the relatively

short time span of one year or less.[5] The home not providing acceptable care would be permitted to operate from one year to the next, secure in the knowledge that if it can obtain a renewal, the slate will be wiped clean and it can safely concentrate on getting by for another year. Under this view, all but the most outrageous or flagrant disregard of the nursing home regulations would be sheltered from the sanction of license revocation. A large portion of the incentive to bring a particular nursing home to standard by inspections, noting defects and requiring improvements, followed by re-inspections to see if the improvements were accomplished, with further inspections and continued insistence on improvement, would disappear. It is a serious step to revoke a license, as the patients are the ones likely to suffer the most—they would have to go elsewhere—and we believe the legislature intended the division should have the chance to work with an operator over a period of several years if necessary before concluding there is no alternative other than revocation of the license.

Respondent points out that the license document issued by the division recites that the nursing home "has complied with the minimum standards of the Division of Health" and argues respondent thus is exonerated from any claims of deficiencies during past license years; that by the division's own certificate, the inquiry is restricted to the current license year. However, the phrasing used on the agency's certificate does not control the issue, the statute does. And in examining the statute, we must remember the legislature was

This is true of hospitals, §§ 197.060, 197.100 RSMo 1969, boarding homes for the aged, §§ 198.410(3), 198.415 RSMo 1973 Supp. and institutions for mentally retarded patients, §§ 202.910(1), 202.920, RSMo 1973, Supp., and others.

5. There are approximately 425 nursing homes in Missouri (according to the briefs), housing approximately 31,000 patients (according to Statistical Abstract of the United States, table 128, p. 82, 1975 ed.) While the record does not state how many trained inspectors are availa-

ble to the division or what funds are appropriated for this purpose, it would seem doubtful there is sufficient money or personnel available to make sure each year that every nursing home has been in compliance throughout the year. This would require several thousand inspections per year by inspection teams made up of several qualified people, as knowledge in the fields of nursing, diet, sanitation, construction, fire prevention, plumbing, recreation and related areas is needed to make an adequate inspection.

well aware of the public's interest in protecting the quality of life of those citizens requiring nursing home care and intended to allow the agency which it charged with the duty of supervision, sufficient latitude in its regulation of nursing homes to effectuate that protection.

■ The director was fully within the law in considering the conduct and deficiencies in the operation of the nursing home in 1968, 1969 and 1970 as well as the current license year, 1971. Violations of rules and regulations in prior years may well have, as they did here, a direct bearing on how the nursing home is operating today. It is significant, for example, that the housekeeping and general cleanliness were poor in the prior years as well as at the present. An isolated or occasional dereliction is one thing, but a chronic state of poor housekeeping and patient care is much different. Such a state of prior facts is not remote and irrelevant to consideration of whether there is compliance with a set of standards as prescribed by rules and regulations. Some may ask, can the director go back 10 years, 15 years? We need not decide that hypothetical in this case. Here we have a continuing series of inspections over a relatively short and continuous span—three to four years—disclosing persistent shortcomings and we rule the director was entitled to consider the entire span in determining whether to revoke the 1971 license.

■ Another matter challenged by respondent before the circuit court was the alleged insufficiency of the director's findings of fact and conclusions of law. The findings of fact identify and quote the applicable portion of each regulation and then give the date when the noncompliance was found to have existed. For instance, one of the findings refers to the pertinent part of regulation 55 (which pertains to required number of nursing personnel and staff) and states "On August 5, 1971, there was neither an RN or an LPN in charge of patient care in your home." Another typical finding refers to that part of regulation 55 which prescribes the minimum nursing care for night hours, depending on the number of patients and percentage who are non-ambulatory, and finds that "On December 12, 1968, December 19, 1969, October 16, 1970, August 5, 1971 and October 9, 1971 the requirement for a licensed practical nurse was not met. On January 29, 1968, March 14, 1968, December 12, 1968, February 17, 1969, December 19, 1969, October 16, 1970, December 17, 1970, April 27, 1971, June 21, 1971, August 5, 1971 and October 9, 1971, there were not sufficient nursing personnel." We believe findings of this type comply with both § 198.140 and § 536.090. The findings inform the licensee and the court of the agency's basis for its decision to revoke and at the same time are concise. We do not find the findings in the present case subject to the defect found in *Iron County v. State Tax Commission,* 480 S.W.2d 65 (Mo.1972), relied on by respondent, where the findings were insufficient to show how the controlling issue had been decided. The findings here relate to violation of specific rules and regulations, followed by the conclusion that the nursing home had failed to satisfy many of the requirements of the rules and regulations and that the same constituted a substantial failure to comply. The point is overruled.

The judgment of the trial court is reversed and the cause is remanded with instructions to affirm the action of the director in revoking respondent's license.

All of the Judges concur.